RYAN B. FRAZIER (Idaho Bar No. 6201)
**KIRTON McCONKIE**
50 East South Temple, Suite 400
Salt Lake City, Utah 84111
Telephone: (801) 328-3600
Facsimile: (801) 321-4893
rfrazier@kmclaw.com

*Counsel for Plaintiff The Northwestern Band of the Shoshone Nation*

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| THE NORTHWESTERN BAND OF THE SHOSHONE NATION, a federally recognized Indian tribe on its own behalf and as *parens patriae* on behalf of its members,<br><br>Plaintiff,<br><br>vs.<br><br>STATE OF IDAHO; and GOVERNOR BRAD LITTLE and DEPARTMENT OF FISH AND GAME DIRECTOR ED SCHRIEVER and DEPARTMENT OF FISH AND GAME ENFORCEMENT BUREAU CHIEF GREG WOOTEN, in their official capacities; and DOES 1–10,<br><br>Defendants. | **COMPLAINT FOR DECLARATORY RELIEF AS TO TREATY STATUS AND INJUNCTIVE RELIEF**<br><br>Case No.: _____<br><br>Judge: _____ |

Plaintiff The Northwestern Band of the Shoshone Nation (the "Northwestern Band"), by and through its undersigned counsel of record, hereby complain against Defendants the State of Idaho, Governor Brad Little, Department of Fish and Game Director Ed Schriever, and DOES 1-10 (collectively, "Defendants") as follows:

## PARTIES

1. The Northwestern Band is a federally recognized sovereign Indian tribe with its tribal offices located at 707 N. Main St. Brigham City, Utah 84302. The Northwestern Band has a Tribal Council whose primary responsibility is to protect the welfare of Northwestern Band members. The Northwestern Band manages hunting resources and authorizes and regulates its members' exercise of the privilege of hunting pursuant to Tribal Code. The Tribe brings this action on its own behalf and as *parens patriae* on behalf of its members who exercise treaty-reserved rights.

2. Defendants are the State of Idaho, and State officials responsible for the implementation and enforcement of the State's hunting laws and regulations. As described more fully below, Defendants have and continue to deprive the Northwestern Band of the exercise of the hunting rights reserved by it and guaranteed to it by the 1868 Treaty of Fort Bridger as follows:

   a. Defendant Brad Little is Governor of Idaho and is sued in his official capacity as Idaho's chief executive officer. The Governor has a constitutional obligation to "see that the laws are faithfully executed." Idaho. Const. art. IV, § 5.

   b. Defendant Ed Schriever is sued in his official capacity as the Director of the Idaho Department of Fish and Game ("IDFG") and exercises authority granted to him under Idaho law and/or delegated to him by the Governor, including the authority to implement and enforce State hunting laws.

   c. Defendant Greg Wooten is sued in his official capacity as Chief of the Enforcement Bureau of the IDFG and exercises authority granted to him under Idaho law and/or delegated to

him by the Governor, or by the Director of the IDFG, including the authority to implement and enforce State hunting laws.

## JURISDICTION AND VENUE

1. This Court has jurisdiction under: (a) 28 U.S.C. § 1331, because this is an action arising under the Constitution, laws or treaties of the United States; and (b) 28 U.S.C. § 1362, because this is an action brought by an Indian tribe with a governing body duly recognized by the Secretary of the Interior, wherein the matter in controversy arises under the Constitution, laws, and treaties of the United States; and (c) 28 U.S.C. § 2201, because this is an action seeking a declaration in a case of actual controversy within the jurisdiction of the Court.

2. This Court has personal jurisdiction over all Defendants under the principles of specific and general jurisdiction as all Defendants reside in Idaho and the facts giving rise to this action occurred in Idaho.

3. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) as all Defendants are subject to personal jurisdiction in Idaho and the Defendants' acts that gave rise to this action were committed within the District of Idaho.

## FACTUAL BACKGROUND

4. For thousands of years the bands of the Shoshone nation and their ancestors have hunted and subsisted on the land in various parts the Great Basin and throughout the Shoshone nation's expansive territory.

5. Prior to the migration westward of the white peoples, the Shoshone nation was a collection of nomadic bands that subsisted on the land through the practices of hunting, fishing, and gathering. By the mid-nineteenth century, the Shoshone Indians roamed over eighty million

acres of prairie, forest and mountain in the present states of Wyoming, Colorado, Idaho and Nevada. Although accounts vary, at the time of westward expansion, the Shoshone nation consisted of an estimated 14 bands.

6. During this period, Washakie was recognized as the main chief of the Shoshone tribe and its affiliated bands. It was the usual custom of Indian tribes, including among the Shoshone Indians, that each band would have its own chief and various subchiefs and headmen.

7. The Northwestern Band, or "northwestern bands" of Shoshone Indians were led by Pocatello, Sanpitz, and Sagiwich. Although some reports indicated that Pocatello was not under the control of Washakie, it was the conclusion of the Indian Claims Commission, as well as the view of the Northwestern Band, that Pocatello tried, but failed, to wrest control of the tribe from Washakie and the tribe rejected his overtures. Thus, Washakie was recognized as the principle chief of all Shoshone Indians.

8. The California gold rush along with the Mormon's settling in the Utah Territory drove an increased number of whites to the west, resulting in the disappearance of game from the hunting grounds of the Shoshone nation. Further, the expansion of the Utah settlements into the arable valleys of southeastern Idaho destroyed the sparse supplies of grass and timber from which the Indians obtained a considerable portion of their livelihood in the form of roots, berries, and nuts. The disappearance of game and destruction of the flora caused the Shoshone Indians to be reduced to conditions of practical starvation, particularly those in southern Idaho and northwestern Utah. The plight of the Shoshone bands living throughout this region caused increased tensions between the Indians and the white travelers.

9. Provided in further detail below, the Shoshone nation and the United States entered a treaty in 1868 at Fort Bridger (the "1868 Fort Bridger Treaty"). Washakie was a signatory to the treaty. The 1868 Fort Bridger Treaty ceded land to the United States, including land occupied and owned by the northwestern bands of the Shoshone nation. The treaty also promised peace in the territory. Further, at issue here, the treaty guaranteed the Shoshone people the right to hunt on unoccupied lands.

10. The State of Idaho does not accept that the northwestern bands of the Shoshone nation were signatories to the 1868 Fort Bridger Treaty, nor does the State of Idaho accept that members of the Northwestern Band—the federally recognized tribal entity of the northwestern bands—have the right to hunt on unoccupied lands pursuant to the treaty.

11. The Northwestern Band brings this action to secure the right of it people to hunt pursuant to the 1868 Fort Bridger Treaty.

*The Bear River Massacre and 1863 Treaties*

12. The Federal Government, in and prior to 1850, and for several years subsequent, was doing practically nothing for the Shoshone Indians in the way of providing them food or supplies. Around this period, the northwestern bands were occasionally aggravated and provoked by unscrupulous white men. The Indians retaliated by attacking white travelers crossing the territory.

13. In an effort to bring about peace, the Superintendent of Indian Affairs made a recommendation that the United States government should provide provision of food and supply aid to the Indians.

14. In July 1862, Congress appropriated funds for negotiating a treaty with the "Shoshones or Snake Indians", as Congress identified them. Thereafter, President Abraham Lincoln appointed a special commission consisting of the Superintendent of Indian affairs in the Territory of Utah, the former Superintendent of Indian Affairs, and an Indian agent in the same Territory—James Doty, Henry Martin, and Luther Mann, respectfully.

15. Supplies, however, did not reach the Indian territory in 1862. Winter set in, and conflicts continued between the Shoshone Indians and the white settlers.

16. In January 1863, Colonel Patrick Edward Conner, commander of the Military District of Utah, learned that a group of Indians from the northwestern bands were camped along the banks of the Bear River in southeastern Idaho. Colonel Conner led more than 200 calvary men to the encampment and massacred between 200-500 Shoshone Indians of the northwestern bands, including women and children. The band led by Chief Sanpitz was essentially exterminated.

17. To this day, the Northwestern Band gathers annually at the site of the massacre, just outside present-day Preston, Idaho, to commemorate the lives of its people that were lost on that fateful day.

18. By the summer of 1863, the Shoshone Indians were living in dire conditions, especially the northwestern band that suffered from unimaginable despair after the Bear River Massacre.

19. Following the Bear River Massacre, between June and October of 1863, five separate treaties were entered between bands of the Shoshone Indians and the United States, including, the Eastern Shoshone Treaty, Northwestern Shoshone Treaty, the Western Shoshone Treaty, the Shoshonee-Goship Treaty, and the Mixed Bands Treaty.

20. The treaty with the northwestern bands—the Northwestern Shoshone Treaty—was entered in Box Elder, Utah Territory, and was signed by Pocatello, who was regarded as principle Chief under Washakie for the northwestern bands (the "1863 Box Elder Treaty"). The treaty was additionally signed by Sanpitz, also a chief, and Commissioner Doty and Colonel Conner.

21. It is generally recognized that the 1863 treaties were intended to be, and were, treaties of peace and amity with annuities paid by the United States for the purpose of accomplishing that objective and achieving that end. The 1863 Box Elder Treaty acknowledges that the northwestern bands have been reduced by war to a state of utter destitution. In exchange for the annuity, the northwestern bands agreed that a firm and perpetual peace shall be maintained with the United States.

22. The 1863 treaties show the cohesion between the eastern Shoshone bands, northwestern Shoshone bands, and mixed-bands of Bannocks and Shoshones at the time of signing. The treaties with the northwestern bands and the mixed-bands ratified and adopted provision of the earlier treaty made with the eastern Shoshone bands and co-mingles annuities paid from their respective treaties. The Goshute Tribe, and the western Shoshone bands, were not as closely aligned with other Shoshone bands and their treaties did not affirm provisions of prior treaties or share annuities.

**The Shoshone Tribe and the 1868 Treaty at Fort Bridger**

23. Each of the respective bands of the Shoshone Indians preferred certain section of the tribe's larger territory as areas of greater attachment. These areas have been coined the "home bases" of the respective Shoshone bands. While the bands each had a feeling of greater attachment

7

to certain areas, or "home bases", they often hunted, fished, gathered, and wintered together throughout the larger Shoshone territory.

24. In 1868, consistent with years prior, the Shoshone Tribe was comprised of Indians who came under the leadership of Washakie. The Shoshone Tribe included, at least, the eastern Shoshone bands, the northwestern Shoshone bands, and the mixed-bands of Bannocks and Shoshones.

25. The Shoshone Tribe desired to enter a lasting compromise with the United States and to be compensated for their land that the western moving white settlers had continued to occupy. On July 3, 1868, at Fort Bridger, Washakie entered a treaty that ceded the Shoshone Tribal Territory, including the territory occupied by the northwestern Shoshone bands, to the United States (i.e. the "1868 Fort Bridger Treaty").

26. The Shoshone nation held Indian title to the lands of the Shoshone territory until those lands were ceded to the United Sates by the 1868 Fort Bridger Treaty.

27. Among other provisions, in exchange for the territory ceded, the United States agreed to establish reservations for Shoshone Indians to live, and agreed, at its own proper expense, to build a warehouse store-room and five other commercial buildings, and a schoolhouse or mission.

28. The parties to the 1868 Fort Bridger Treaty also agreed that the Indians shall have the right to hunt on the unoccupied land of the United States so long as game may be found thereon, and so long as peace subsists among the whites and Indians on the boarder of the hunting districts.

***The Northwestern Band of the Shoshone Nation, from the Bear River Massacre to Present Day***

29. The Northwestern Band is a federally recognized tribal unit with all the political, economic, medical, and cultural protections. The Northwestern Band does not reside on Reservations at Fort Hall, Idaho, or Wind River, Wyoming.

30. The Northwestern Band, as noted prior, was comprised of the "northwestern bands" of Indians that were nomadic hunters and gatherers. However, after the Bear River Massacre and continued intrusion of white settlers on their land, what left of the northwestern Shoshone Indians were near starvation and destitute.

31. The reservations promised in the 1868 Treaty of Fort Bridger were slow in coming and the Northwestern Shoshones had to devise a new method of survival or perish. The Northwestern Band settled in northern Utah and adapted to an agrarian way of live. Dating back to the 1868 Treaty of Fort Bridger, the 1863 Treaty at Box Elder, the 1863 Massacre at Bear River, and prior, the northwestern bands of Shoshone Indians have maintained an active political and cultural organization. In addition, their relationship with other Shoshone bands is the same today as it was in 1868.

*Prior Adverse Action and State's Position in 1997*

32. On December 20, 1997, Shane Warner and his brother Wayde Warner, each members of the Northwestern Band, were cited and found guilty of hunting out of season. Each were in possession of hunting tags issued by the Northwestern Band (Idaho Case No. CR-98-00014; and CR-98-00015). The Warner brothers claimed Treaty rights under the 1868 Fort Bridger Treaty. The State of Idaho refused to recognize the Northwestern Band as a signatory to the 1868 Fort Bridger Treaty; consequently, has refused to honor the hunting rights contained therein. Additionally, the State of Idaho has taken the position that if the Northwestern Band is ruled a

9

signatory to the treaty, then the Northwestern Band has not maintained sufficient political continuity to maintain its treaty rights.

33. The Idaho Court of Appeals sided in part, with the State of Idaho. The Court recognized that Washakie was the leader of the Shoshone Tribe, including the Northwestern Band. However, the Idaho Court held that the Northwestern Band has not maintained sufficient political continuity to maintain its rights under the 1868 Fort Bridger Treaty. Therefore, the Warner bother's convictions for hunting out of season were upheld.

*Present Adverse Actions*

34. On December 11, 2019, Wyatt R. Athay and Shanelle M. Long, each tribal members of the Northwestern Band, were cited for hunting without tags issued by the State of Idaho (Case Nos. CR-04-19-0756; CR0419-0757). Mr. Athay and Ms. Long have asserted their hunting right under the 1868 Fort Bridger Treaty. The parties have agreed to stay the matter pending the filing of this action, wherein, the Northwestern Band seeks a declaration that it has hunting rights under the 1868 Treaty at Fort Bridger.

**FIRST CLAIM FOR RELIEF**
**(Declaration of Treaty Status)**

35. Northwestern Band hereby incorporates all preceding paragraphs of this Complaint as if fully set forth herein.

36. The Northwestern Band is a signatory to the 1868 Treaty of Fort Bridger.

37. As a tribe that signed the 1868 Treaty of Fort Bridger and has maintained a continuous organized structure since, the Northwestern Shoshone Band is entitled to exercise rights thereunder.

38. The Northwestern Band's treaty reserved hunting rights are a property right which is protected by Article V of the United States Constitution, as applied through the Fourteenth Amendment, which cannot be deprived without due process of law and just compensation.

39. Treaties are the supreme law of the land, and are binding within the territorial limits of the states, and can only be modified or abrogated by an act of Congress. U.S. Const., art. VI, cl. 2. The Northwestern Band's reserved treaty hunting rights are privileges recognized by the U.S. Constitution and the treaty with the United States.

40. There is no act of Congress modifying or abrogating the Northwestern Shoshone Band's treaty rights.

41. The Northwestern Band's treaty reserved hunting rights continue against the United States and its grantees, as well as against the State and counties, and their grantees.

**FIRST CLAIM FOR RELIEF**
**(Violation of Equal Protection)**

42. Northwestern Band hereby incorporates all preceding paragraphs of this Complaint as if fully set forth herein.

43. The Equal Protection Clauses of the Fourteenth Amendment to the United States Constitution requires that a State shall not deny and person the equal protection of the laws.

44. Acting under color of state law, Defendants have denied the Northwestern Shoshone Band and its members the same protection of fundamental rights afforded to other Shoshone bands who were treaty signatories and their members.

45. The Northwestern Band's treaty hunting and gathering rights may not be qualified by any action of the State.

46. The Northwestern Band's members have, are and continue to be harmed by the actions of Defendants unlawfully treating the Tribe and its members differently than similarly situated Idaho State Shoshone bands who were treaty signatories when they omit the Northwestern Shoshone Band from the list of tribes with reserved hunting rights secured under the 1868 Treaty of Fort Bridger, seek to deny the Northwestern Shoshone Band's treaty status, and exclude the Northwestern Shoshone Band from opportunities pertaining to treaty hunting on that basis.

## PRAYER FOR RELIEF

WHEREFORE, the Tribe prays for the following relief:

A. For a declaration that the Northwestern Band is a signatory to the 1868 Treaty at Fort Bridger, that Northwestern Band maintains the right to hunt pursuant the terms of the treaty, and that such rights have not been abrogated by Congress;

B. For an injunction requiring Defendants to comply with Federal law; and

C. For such other relief as the Court deems just, equitable and proper.

DATED this 14th day of June, 2021.

        Respectfully Submitted,

        KIRTON McCONKIE

        By /s/ Ryan B. Frazier
          Ryan B. Frazier
          *Counsel for Plaintiff The Northwestern Band of the Shoshone Nation*