LAWRENCE G. WASDEN
ATTORNEY GENERAL
STATE OF IDAHO
DARRELL G. EARLY
Chief, Natural Resources Division
KATHLEEN E. TREVER (Idaho Bar No. 4862)
OWEN H. MORONEY (Idaho Bar No. 9553)
Deputy Attorneys General
600 S. WALNUT STREET
P.O. BOX 25
BOISE, ID 83707
TELEPHONE: (208) 334-3715
FAX: (208) 334-4885
E-Mail:  kathleen.trever@idfg.idaho.gov
          owen.moroney@idfg.idaho.gov

*Attorneys for Defendants State of Idaho; and Governor Brad Little, Department of Fish and Game Director Ed Schriever, and Department of Fish and Game Enforcement Bureau Chief Greg Wooten, in their official capacities.*

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| THE NORTHWESTERN BAND OF THE SHOSHONE NATION, a federally recognized Indian tribe on its own behalf and as *parens patriae* on behalf of its members, | Case No. 4:21-CV-00252-CWD |
| Plaintiff, | MEMORANDUM IN SUPPORT OF MOTION TO DISMISS |
| v. | |
| STATE OF IDAHO; and GOVERNOR BRAD LITTLE and DEPARTMENT OF FISH AND GAME DIRECTOR ED SCHRIEVER and DEPARTMENT OF FISH AND GAME ENFORCEMENT BUREAU CHIEF GREG WOOTEN, in their official capacities; and DOES 1-10, | |
| Defendants. | |

Defendants State of Idaho; and Department of Fish and Game Director Ed Schriever and Enforcement Bureau Chief Greg Wooten, in their official capacities, (collectively "State Defendants") hereby submit this Memorandum in support of their Motion to Dismiss under Fed. R. Civ. P. 12(b)(1), 12(b)(6), 12(b)(7) and 19. Plaintiff and State Defendants concurrently file a stipulation to dismiss Governor Little as a Defendant under Fed. R. Civ. P. 41(a)(1)(A)(ii).

## **BACKGROUND**

The Shoshone people once roamed over eighty million acres in the present states of Wyoming, Colorado, Utah, Idaho, and Nevada. *Nw. Bands of Shoshone Indians v. United States*, 324 U.S. 335, 340, *reh'g denied* 324 U.S. 890 (1945); *Compl.* ¶ 5. The Shoshone nation had an estimated fourteen different bands with various chiefs, sub-chiefs or headmen. *Nw. Bands of Shoshone Indians v. United States*, 95 Ct. Cl. 642, 644 (1942), *aff'd*, 324 U.S. 335 (1945); *Compl.* ¶ 5. In 1862, Congress appropriated money for negotiating a treaty with the Shoshone to secure safe passage for transportation and communication lines through Shoshone territory. *Nw. Bands of Shoshone Indians*, 324 U.S. at 341; *Compl.* ¶ 14.

Due to the vast size of Shoshone territory, the U.S. government found it impractical to gather the Shoshone nation into one council for treaty purposes, and instead made several treaties with the Shoshone to resolve disputes. *Nw. Bands of Shoshone Indians*, 324 U.S. at 341-2; *Compl.* ¶ 19. One of these treaties was made with "Northwestern Bands" of Shoshone (noting "bands" in the plural) on July 30, 1863. *Nw. Bands of Shoshone Indians*, 324 U.S. at 343-44; *Treaty with the Shoshoni - Northwestern Bands*, 13 Stat. 663 (1863) (hereinafter "Box Elder Treaty"); *Compl.* ¶ 20. The Box Elder Treaty essentially contains a promise of peace and a promise to pay annuities to the signatory bands. *See generally* Box Elder Treaty, 13 Stat. 663;

*Compl.* ¶ 21. The Box Elder Treaty does not discuss or otherwise reserve hunting and fishing rights. *See generally* Box Elder Treaty, 13 Stat. 663.

On July 3, 1868, the United States entered into a treaty with the Eastern Shoshone and Bannock tribes. *Treaty with the Eastern Band Shoshoni and Bannock*, 1868, 15 Stat. 673 (hereinafter "Fort Bridger Treaty of 1868"); *Compl.* ¶ 25. The Fort Bridger Treaty of 1868 ceded Shoshone tribal territory in exchange for, among other things, creating two reservations and preserving off-reservation hunting rights for the Eastern Shoshone and Bannock tribes. Fort Bridger Treaty of 1868, 15 Stat. 673; *Compl.* ¶¶ 27-28. Article 2 of the Treaty describes the creation of two reservations, now known as the Fort Hall and Wind River Reservations. *Id.*; *Nw. Bands of Shoshone Indians*, 95 Ct. Cl. at 678; *see also Compl.* ¶ 29. Article 2 of the Treaty describes the original boundaries of the Wind River Reservation. Fort Bridger Treaty of 1868, 15 Stat. 673. In concert with the Treaty, the Fort Hall Reservation was delineated through two executive orders signed by President Johnson on June 14, 1867, and President Grant on July 30, 1869. 1 Kappler, Indian Affairs: Laws and Treaties 836-37, 838-39 (2d ed. 1904).

Article 4 of the Fort Bridger Treaty of 1868 addresses reserved hunting and fishing rights. Article 4 is expressly limited to "[t]he Indians herein named" (i.e., the Eastern Shoshone and Bannock tribes). Fort Bridger Treaty of 1868, 15 Stat. 673. Article 4 requires the named tribes to "make [the Fort Hall and Wind River] reservations their permanent home, and . . . make no permanent settlement elsewhere. . . ." *Id.* In the same sentence requiring the tribes to make the reservations their permanent homes, Article 4 provides "but they shall have the right to hunt[1] on

---

[1] In *State v. Tinno,* the Idaho Supreme Court ruled the word "hunt" in the treaty referred to both hunting and fishing, as the Shoshone-Bannock Tribes did not historically employ separate verbs to distinguish between these activities. *State v. Tinno,* 497 P.2d 1386, 1390 (1972).

the unoccupied lands of the United States so long as game may be found thereon, and so long as peace subsists among the whites and Indians on the borders of the hunting districts." *Id*.

In short, a fundamental premise of the Fort Bridger Treaty of 1868 was the United States wished the tribes to permanently locate themselves on the reservations; in exchange, the tribes asked for the privilege of leaving the reservations to hunt and fish. *State v. Cutler*, 708 P.2d 853, 857–58 (1985) (describing how United States treaty representatives stated the "great father" wished the tribes to go to a reservation "to make it your permanent home" and Chief Washakie stated "[I] want the privilege of going over the mountains to hunt where I please").

This premise was reiterated in a subsequent agreement between the United States and the Shoshone and Bannock Tribes. *An Act to Ratify an Agreement with the Indians of the Fort Hall Indian Reservation in Idaho, and Making Appropriations to Carry the Same into Effect*, 31 Stat. 672 (1900) (hereinafter "1898 Agreement"). In 1898, the United States entered into an agreement, ratified by Congress, with the "Shoshone and Bannock Indians of the Fort Hall Reservation" where the tribes agreed to "dispose of part of their surplus lands in the State of Idaho, reserved as a home for them by a treaty concluded at Fort Bridger....." *Id.* Echoing the Fort Bridger Treaty of 1868, Article 4 of the 1898 Agreement included a requirement that the tribes live on the reduced reservation to exercise off-reservation hunting and fishing rights on ceded lands:

> So long as any of the lands ceded, granted, and relinquished under this treaty remain part of the public domain, *Indians belonging to the above-mentioned tribes, and living on the reduced reservation, shall have the right,* without any charge therefore, to cut timber for their own use, but not for sale, and to pasture their livestock on said public lands, and *to hunt thereon and to fish in the streams thereof.*

*Id.* (emphasis added).

By the 1870s, the majority of the Northwestern bands' members had integrated into the two reservations.[2] However, as alleged by Plaintiff, the band whose descendants comprise the Northwestern Band of the Shoshone Nation (hereinafter "Northwestern Band") did not move onto the reservations but rather "settled in northern Utah and adapted to an agrarian way of li[f]e" *Compl.* ¶ 31. The Northwestern Band is a federally recognized tribe, distinct from the

---

[2] The Supreme Court described the history of the Northwestern bands in the following way:

> After the making of the treaty of July 30, 1863, the plaintiff bands became widely scattered over northern Utah and Nevada, and southern Idaho. In 1873 the Commissioner of Indian Affairs appointed a commission to investigate all tribes and bands in this region and to ascertain their number and the probability of gathering them upon one or more reservations where they could be more immediately under the care of the Government. The commission made an exhaustive investigation into the matters entrusted to it had reported that it had no trustworthy information as to the number of bands of the Northwestern Shoshone Indians. The commission further reported that a part of the Northwestern Shoshones under Pocatello (who signed the treaty of July 30, 1863) had already gone to the Fort Hall (Idaho) Reservation in southeast Idaho, and that Chief Tav-i-wun-shea, with his small band, had gone to the Wind River (Wyoming) Reservation created and set apart under the treaty with the Eastern Shoshones in 1868. Toomontso (who had signed the Northwestern Treaty of July 30) and his band at about this time took up their abode on the Fort Hall Indian Reservation and an indefinite number of Indians of this band had gone to the Wind River Reservation. Eventually the remnants of the bands of Indians under San Pitz (a signer of the Northwestern Shoshone treaty of July 30), and Saigwits, also a party to the treaty, were induced by the commission to remove to the Fort Hall Indian Reservation, thus making a total of 400 Northwestern Shoshone Indians on the Fort Hall Reservation. The commission further reported that a careful enumeration disclosed that there were 400 Northwestern Shoshone Indians in southern Idaho. In 1873 a number of Northwestern Shoshone Indians had gathered in northeastern Nevada and were assigned by the Indian Agent in Nevada to a small area in that section as a home. On May 10, 1877, this tract, by order of the President, was withdrawn from sale or settlement and set apart as a reservation for the Northwestern Shoshone Indians. However, in 1879, all the Indians thereon, numbering about 300, were removed to the Western Shoshone Indian Reservation known as the Duck Valley Indian Reservation in southwestern Idaho and northern Nevada.

*Nw. Bands,* 324 U.S. at 335, 345 n. 7 (quoting *Nw. Bands*, 95 Ct. Cl. at 677–78).

Shoshone-Bannock Tribes of the Fort Hall Reservation and the Eastern Shoshone Tribe of the Wind River Reservation, which are also both federally recognized. *Indian Entities Recognized by and Eligible To Receive Services From the United States Bureau of Indian Affairs*, 86 FR 7554-01; *Compl.* ¶¶ 1, 39. The Northwestern Band is a distinct "sovereign Indian tribe" with its own Tribal office and Tribal Code, and "[t]he Northwestern Band does not reside on the Fort Hall or Wind River Reservations." *Compl.* ¶¶ 1, 29.

The Northwestern Band now brings this lawsuit. The Northwestern Band claims reserved treaty rights under the Fort Bridger Treaty of 1868 and otherwise alleges that State Defendants have violated its right to equal protection. *Compl.* ¶35-46.

## **LEGAL STANDARD**

State Defendants have moved to dismiss pursuant to Fed. R. Civ. P. 12(b)(1), 12(b)(6), 12(b)(7) and 19.

"Although sovereign immunity is only quasi-jurisdictional in nature, Rule 12(b)(1) is still a proper vehicle for invoking sovereign immunity from suit." *Pistor v. Garcia,* 791 F.3d 1104, 1111 (9th Cir. 2015). Plaintiffs bear the burden of persuasion when jurisdiction is challenged under Rule 12(b)(1). *Indus. Tectonics, Inc. v. Aero Alloy*, 912 F.2d 1090, 1092 (9th Cir. 1990). A Rule 12(b)(1) challenge may be facial or factual. *White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000) (citation omitted). Where a challenger asserts a complaint's allegations are insufficient on their face to establish federal jurisdiction, a court must construe the complaint's allegations as true and in a light most favorable to the plaintiff. *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004). With a factual Rule 12(b)(1) attack, a court may look beyond the complaint to matters of public record without having to convert the motion into one for summary judgment. *White,* 227 F.3d at 1242 (citation omitted).

Rule 12(b)(6) permits dismissal of a claim if a plaintiff "fail[s] to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "A Rule 12(b)(6) dismissal may be based on either a 'lack of a cognizable legal theory' or 'the absence of sufficient facts alleged under a cognizable legal theory.' " *Johnson v. Riverside Healthcare Sys., LP*, 534 F.3d 1116, 1121 (9th Cir. 2008) (citation omitted). In considering a Rule 12(b)(6) motion, courts must view the complaint in the light most favorable to the plaintiff and "accept[ ] all well-pleaded factual allegations as true, as well as any reasonable inference drawn from them." *Johnson*, 534 F.3d at 1122. In determining whether to grant a Rule 12(b)(6) dismissal, a court may not look at matters outside the complaint. *Schneider v. Calf. Dep't of Corrections*, 151 F.3d 1194, 1197 (9th Cir. 1998).

When ruling on a Rule 12(b)(7) motion to dismiss, courts must accept allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor. *Dine Citizens Against Ruining Our Env't v. Bureau of Indian Affs.*, 932 F.3d 843, 851 (9th Cir. 2019), *cert. denied* 141 S. Ct. 161 (2020). Because the outcome of a Rule 12(b)(7) motion does not decide the claim's validity, a court may consider matters outside the pleadings without converting the motion to dismiss into a motion for summary judgment. 5C Charles Alan Wright et al., *Federal Practice and Procedure* § 1359 (3d ed. 2018); *see also Tinoco v. San Diego Gas & Elec. Co.*, 327 F.R.D. 651, 657 (S.D. Cal. 2018). The moving party bears the burden of persuasion. 5C Charles Alan Wright et al., *Federal Practice and Procedure* § 1359 (3d ed. 2018); *see also Tinoco*, 327 F.R.D. at 657.

## ARGUMENT

This Court should dismiss this case for failure to join the tribes who have maintained political cohesion with the signatories to the Fort Bridger Treaty of 1868. Those tribes have

recognized treaty hunting rights through continued compliance with treaty terms by making the established reservations their permanent homes under their tribal governance. No court has recognized the Northwestern Band as having treaty reserved hunting and fishing rights. Allowing this case to go forward in the absence of the tribes that are the long-standing recognized holders of these rights is extremely prejudicial to those tribes, subjecting them to the risk that their hunting and fishing rights will be diluted and impaired.

Moreover, the Northwestern Band's Complaint fails to state a cognizable claim under the Fort Bridger Treaty of 1868, as the Northwestern Band admits it does not reside on the relevant reservations and admits it has not maintained political cohesion with the recognized signatory tribes. Further, the claims for relief against the State of Idaho are barred under the Eleventh Amendment of the U.S. Constitution.

1.     **The Court should dismiss this case for failure to join an indispensable party pursuant to Rule 12(b)(7).**

The Northwestern Band's Complaint should be dismissed under Rules 12(b)(7) for failure to join a necessary and indispensable party that cannot be joined due to sovereign immunity, the Shoshone-Bannock Tribes of the Fort Hall Indian Reservation.[3] Rule 19 determines whether a party is required to be joined. The Court must determine two issues under Rule 19: (1) if an absent party is necessary to the suit, and (2) if an absent, necessary party cannot be joined, whether in "equity and good conscience" the action should proceed among the existing parties or should be dismissed. *Makah Indian Tribe v. Verity*, 910 F.2d 555, 558 (9th

---

[3] The Eastern Shoshone Tribe of the Wind River Reservation is also a signatory to the Fort Bridger Treaty of 1868, 15 Stat. 673, and is also a necessary and indispensable party for the same reasons as the Shoshone-Bannock Tribes. However, given that no court has recognized the Eastern Shoshone Tribe as having hunting and fishing rights within Idaho, this memorandum focuses on the clear and direct interests of the Shoshone-Bannock Tribes.

Cir. 1990) (citing Fed. R. Civ. P. 19). "The inquiry is a practical one and fact specific . . . and is designed to avoid the harsh results of rigid application." *Makah Indian Tribe,* 910 F.2d at 558 (citations omitted).

To determine whether a party must be joined, Rule 19(a) asks the Court to determine whether (1) complete relief can be granted in the non-party's absence or (2) whether the non-party has a "legally protected interest in the subject of the suit such that a decision in its absence will impair or impede its ability to protect that interest; or [] expose [the parties] to the risk of multiple or inconsistent obligations." *Dawavendewa v. Salt River Project Agr. Imp. & Power Dist.*, 276 F.3d 1150, 1155 (9th Cir.), *cert. denied* 537 U.S. 820 (2002) (*citing* FRCP 19(a) and *Makah*, 910 F.2d at 558).

It is beyond doubt that the Shoshone-Bannock Tribes have a significant, legally protected interest in hunting and fishing rights reserved under the Fort Bridger Treaty of 1868. Idaho state and federal courts have long interpreted the Fort Bridger Treaty of 1868 as reserving the Tribes' hunting and fishing rights on unoccupied lands of the United States within the Tribes' territory in Idaho. *Tinno*, 497 P.2d 1386; *Cutler*, 708 P.2d 853; *Swim v. Bergland*, 696 F.2d 712, 714 (9th Cir. 1983). The Northwestern Band's Complaint references *State of Idaho v. Warner*, an Idaho district court case in which over twenty years ago the Shoshone-Bannock Tribes appeared in *amicus curiae* capacity to successfully oppose the assertions of two individuals (charged with violation of state hunting laws) that they had hunting rights under the Fort Bridger Treaty of 1868 as members of the Northwestern Band.[4] *See* Appendix A at 2.

---

[4] The complaint referenced *State v. Warner* as an "Idaho Court of Appeals" decision, but this was an Idaho district court decision made in an appellate capacity, reviewing a magistrate court decision. *See Compl.* ¶¶ 32, 33; Appendix A.

Not only have the Shoshone-Bannock Tribes engaged in legal actions to preserve their treaty hunting and fishing rights, they have also enacted a detailed set of laws to govern hunting and fishing among their members. One stated purpose of the Shoshone-Bannock Tribes' Tribal Code is "regulating and protecting the treaty rights of the tribes and to protect the wildlife on ceded lands and on unoccupied lands of the United States . . . ." Sec. 11-1-1, Shoshone-Bannock Tribal Code.[5] The Tribal Code further prescribes that "the acquisition of wildlife pursuant to treaty rights shall be protected an[d] managed by the Shoshone-Bannock Tribes and as prescribed by the laws of the Tribes." Sec. 11-1-4(b), Shoshone-Bannock Tribal Code. The Shoshone-Bannock Fish and Game Commission sets seasons and limits for the take of fish and wildlife, and the Shoshone-Bannock Fish and Game Department and associated game wardens enforce laws related to fish and wildlife. Sec. 11-1-5 to 11-1-6, Shoshone-Bannock Tribal Code.

The Tribal Code recognizes the Fort Bridger Treaty's requirement to live on-reservation to exercise off-reservation hunting and fishing rights by prescribing that: "*Only enrolled members of the Shoshone-Bannock Tribes who make the Fort Hall Reservation their permanent home shall enjoy the off-Reservation Tribal hunting and fishing rights* as set forth pursuant to the Fort Bridger Treaty of July 3, 1868 . . . ." Sec. 11-1-8(b), Shoshone-Bannock Tribal Code (emphasis added).

Allowing this proceeding to move forward in the absence of the Shoshone-Bannock Tribes would impair and impede the Tribes' ability to protect their interests in their hunting and fishing rights reserved under the Fort Bridger Treaty of 1868. Both of the Northwestern Band's

---

[5] Title 11, Law and Order Code Shoshone-Bannock Tribes of the Fort Hall Reservation, Idaho, *available at* *https://library.municode.com/tribes_and_tribal_nations/shoshone-bannock_tribes/codes/the_law_and_order_code?nodeId=CD_TIT11FIGA*.

claims for relief ask this Court to recognize the Northwestern Band as having treaty status under the Fort Bridger Treaty of 1868, and a hunting and fishing right across broad swaths of unoccupied lands of the United States that parallel the Shoshone-Bannock Tribes' hunting and fishing rights. *Compl.* ¶¶ 35-46. Such relief would interrupt the long-understood *status quo* of the Shoshone-Bannock Tribes as being the only Tribes recognized as having off-reservation rights under the Fort Bridger Treaty of 1868 within Idaho.

Moreover, as alleged in the Complaint, the Northwestern Band is a separate tribe with a separate Tribal Code. Recognition of the Northwestern Band's alleged treaty right would diminish the Shoshone-Bannock Tribes' right by introducing new competition for limited fish and game resources by a tribe outside of the Shoshone-Bannock Tribes' regulatory authority. Simply put, no court has held the Northwestern Band has treaty rights under the Fort Bridger Treaty of 1868. The Northwestern Band now asks the Court to force the Shoshone-Bannock Tribes to share their off-reservation hunting and fishing rights with another tribe without the Tribes being a party to this case.

In similar cases, courts have recognized the conflicting interests among tribes that arise when multiple tribes are granted treaty hunting and fishing rights to the same limited resources. In *Makah Indian Tribe,* the Ninth Circuit agreed with a district court's ruling that "any share that goes to the Makah must come from [the] other tribes." 910 F.2d at 559. Likewise, "claims for allocation of a limited resource do not present a situation in which multiple parties share compatible interests, but rather are more analogous to a request by a beneficiary to allocate a common fund." *Skokomish Indian Tribe v. Goldmark,* 994 F. Supp. 2d 1168, 1187–88 (W.D. Wash. 2014), *citing Makah Indian Tribe*, 910 F.2d at 558.

The Shoshone-Bannock Tribes have taken significant steps to defend and regulate their share of finite fishing and hunting resources, which would be jeopardized should additional parties have access to their tribal share. For example, the Shoshone-Bannock Tribes have a program for off-reservation fishing allowing the take of Endangered Species Act (ESA) listed anadromous fish, including chinook salmon and steelhead. *Endangered and Threatened Species; Take of Anadromous Fish*, 78 Fed. Reg. 4,836-01 (January 23, 2013) (approving the Tribes' Tribal Resource Management Plan for take of salmon and steelhead). Allowing the Northwestern Band to use the same treaty rights to access the same fish would clearly impair and diminish the Shoshone-Bannock Tribes' treaty rights and further limit the Tribes' share of available ESA-protected fish.[6]

In short, should the Court grant the relief requested by the Northwestern Band, the Shoshone-Bannock Tribes' hunting and fishing rights would have less value than they do now. Therefore, the Shoshone-Bannock Tribes are required parties. Under Rule 19, required parties will generally be joined as a party to an action. *Quileute Indian Tribe v. Babbitt*, 18 F.3d 1456, 1459 (9th Cir. 1994). Where the United States has not brought the action, Indian tribes may not be joined unless they waive their sovereign immunity. *Id.*; *Santa Clara Pueblo v. Martinez*, 436

---

[6] Additionally, allowing the Northwestern Band to assert treaty rights under the Fort Bridger Treaty of 1868 without the Tribes present in the litigation creates a risk that other groups could assert rights under the treaty and have their rights adjudicated without the Tribes' involvement in later proceedings. As alleged in the Complaint, the Shoshone nation was large, comprised of "a collection of nomadic bands" that in the mid-nineteenth century "roamed over eighty million acres" with "an estimated 14 bands." *Compl.* ¶¶ 5. The Complaint recognizes that there were groups including mixed-bands of Bannocks and Shoshones, the Western Shoshone bands, and the Goshute Tribe. *Id.* at ¶ 22. Allowing this action to proceed without the recognized signatory tribes/ beneficiaries of the Fort Bridger Treaty of 1868 would potentially open the Tribes' rights under that treaty to fragmentation among other groups living outside the Fort Hall Reservation.

U.S. 49, 58-59 (1978). There has been no such waiver of sovereign immunity by the Tribes so they cannot be joined in this suit.

As the Shoshone-Bannock Tribes cannot be joined in this suit, the Court's next step is determining whether in "equity and good conscience" the action should proceed among the existing parties or should be dismissed. *Makah Indian Tribe*, 910 F.2d at 558 (citing Fed. R. Civ. P. 19). Rule 19(b) provides the factors for this Court to consider in determining whether this case should proceed in the absence of the Shoshone-Bannock Tribes or be dismissed:

> (1) the extent to which a judgment rendered in the person's absence might prejudice that person or the existing parties;
> (2) the extent to which any prejudice could be lessened or avoided by:
> > (A) protective provisions in the judgment;
> > (B) shaping the relief; or
> > (C) other measures;
> (3) whether a judgment rendered in the person's absence would be adequate; and
> (4) whether the plaintiff would have an adequate remedy if the action were dismissed for nonjoinder.

Fed. R. Civ. P. 19(b).

The first factor, prejudice to existing or absent parties, is essentially the same as the legally protected interest test under Rule 19(a) discussed above. *Quileute Indian Tribe*, 18 F.3d at 1460 ("prejudice test is essentially the same as legal interest test") (citing *Confederated Tribes of Chehalis Indian Reservation v. Lujan*, 928 F.2d 1496, 1499 (9th Cir. 1991)). The prejudice prong of Rule 19(b) weighs in favor of dismissing the action. As described above, litigating a hunting and fishing right under the Fort Bridger Treaty of 1868 without the Shoshone-Bannock Tribes is prejudicial, because an outcome in the Northwestern Band's favor would dilute the Shoshone-Bannock Tribes' long-standing hunting and fishing rights under that treaty. The Northwestern Band essentially seeks a court declaration that the Shoshone-Bannock Tribes are no longer the sole entity entitled to exercise Fort Bridger Treaty rights within Idaho, but instead

must share those rights with the Northwestern Band—something analogous to going from sole

property ownership to an undivided interest in a tenancy in common.

Regarding the second factor, it is simply not possible to tailor relief in a way that could

lessen the prejudice to the Shoshone-Bannock Tribes. The relief sought by the Northwestern

Band is a declaration from the Court that the Band has treaty status under the Fort Bridger Treaty

of 1868, which would include reserved hunting and fishing rights. *Compl.* ¶¶ 35-46. This relief

is simple, and seeks an all-or-nothing determination that treaty rights exist. If the Court

determines that the Northwestern Band has hunting and fishing rights identical to those held by

the Shoshone-Bannock Tribes, the Tribes' hunting and fishing rights are diminished. There is no

middle ground. In *Skokomish Indian Tribe,* the court faced a similar suit and found that the "[t]he

all-or-nothing nature of the . . . interests favors dismissal." 994 F. Supp. 2d at 1190. Likewise,

here the Court should determine that the second factor favors dismissal, as there is no way to

tailor relief in a way that does not prejudice the Tribes.

The third factor, whether a judgment rendered in the Tribes' absence would be adequate,

also favors dismissal. This factor refers to the "public stake in settling disputes by wholes,

whenever possible . . . ," rather than focusing on a potential judgment from a plaintiff's

perspective. *Republic of Philippines v. Pimentel*, 553 U.S. 851, 870 (2008). Here, a judgment in

a proceeding that omits the Shoshone-Bannock Tribes would not be adequate, since the Court

would be deprived of hearing from the recognized holders of rights under the Fort Bridger Treaty

of 1868. Accordingly, the third factor favors dismissal.

Finally, the fourth factor, the existence of an adequate remedy if the action were

dismissed, is dealt with in the context of sovereign immunity. The Ninth Circuit has consistently

held that a tribe's sovereign immunity outweighs the lack of alternative forum. *United States v.*

*Washington*, 573 F.3d 701, 708-9 (9th Cir. 2009) (describing how "not all problems have judicial solutions" and how courts may be poorly positioned to resolve disputes among tribes); *Dawavendewa*, 276 F.3d at 1162; *Confederated Tribes of Chehalis Indian Rsrv.*, 928 F.2d at 1500; *Makah Indian Tribe*, 910 F.2d at 560. While dismissal of this case might seem harsh, letting the case proceed without the Shoshone-Bannock Tribes is likewise a harsh outcome and would ignore the Tribes' longstanding sovereign interest in hunting and fishing rights under the Fort Bridger Treaty of 1868. The Northwestern Band has others means of resolving this issue. It could negotiate directly with the Shoshone-Bannock Tribes. *See U.S. v. Washington,* 573 F.3d at 708-709. The Band could also seek involvement of the United States. *See Dawavendewa*, 276 F.3d at 1162 ("Sovereign immunity does not apply in a suit brought by the United States.").

In sum, the Northwestern Band asks the Court to declare it has treaty rights under the Fort Bridger Treaty of 1868 in an *Ex parte Young* lawsuit against state officials in which it has failed to join the Tribes who are the long-standing recognized holder and beneficiary of those treaty rights in Idaho. If this case proceeds without the Shoshone-Bannock Tribes, the Tribes' treaty hunting and fishing rights could be impaired. The Band has alternatives for addressing its claims through intertribal negotiations or United States' involvement. Accordingly, the Shoshone-Bannock Tribes' sovereign immunity interests should outweigh the Northwestern Band's choice of an action against state officials addressing the Band's claim of rights under the Fort Bridge Treaty of 1868. The Court should dismiss this matter for failure to join the Shoshone-Bannock Tribes.

**2**.     **The Court should dismiss this case for failure to state a claim upon which relief can be granted pursuant to Rule 12(b)(6).**

The Northwestern Band's Complaint fails to state a claim upon which the relief it seeks can be granted. Taking the facts alleged in the Complaint to be true, the Northwestern Band is

not entitled to hunting and fishing rights under the Fort Bridger Treaty of 1868 because the Northwestern Band admits in its Complaint that it has not made its permanent home on either of the relevant reservations and has not maintained political cohesion with the tribes named in the Treaty. Both of these are required by the plain language of the Fort Bridger Treaty of 1868. Accordingly, the Complaint should be dismissed.

a.   **The Northwestern Band's Complaint admits it has not complied with the plain terms of the Fort Bridger Treaty of 1868 because it has not made the Fort Hall or Wind River Reservation its permanent home.**

Article 2 of the Fort Hall Treaty of 1868 describes the reservations referred to in Article 4 of the Treaty. Article 2 sets forth the boundaries of the Wind River Reservation. It also authorizes the President to establish a suitable reservation for the Bannacks, which provision was carried out by an 1869 executive order setting forth the President's finding that the previously established Fort Hall Reservation fulfilled the promise in Article 2 to establish a reservation for the Bannacks. 1 Kappler, Indian Affairs: Laws and Treaties 836-37, 838-39. Article 4 requires the Indians to make the two named reservations their permanent homes, but then sets forth an exception allowing hunting on unoccupied lands of the United States. The hunting right's status as an exception conditioned upon residency on one of the two reservations is demonstrated by usage of the word "but" to begin the clause setting forth the hunting right. The United States could not have been more explicit in limiting the hunting and fishing right to the Indians making the two named reservations their permanent homes.

The negotiation history of the Fort Bridger Treaty of 1868 and later agreements further support this interpretation. *See Cutler*, 708 P.2d at 857–58 (Idaho Supreme Court review of negotiation history); 1898 Agreement, 31 Stat. 672 (Article 4 of the 1898 agreement between the Shoshone-Bannock Tribes and the United States including similar provision for the exercise of fishing and hunting rights on lands ceded under that agreement). The Shoshone-Bannock Tribal

Code is also consistent with this interpretation, by limiting the exercise of off-reservation hunting and fishing rights to members who make the Fort Hall Reservation their permanent home. Sec. 11-1-8(b), Shoshone-Bannock Tribal Code.

In this case, the Northwestern Band has failed to allege facts showing it makes either the Fort Hall or Wind River Reservations its permanent home; indeed, it has failed to allege that the Band has ever made either reservation its permanent home. To the contrary, the Northwestern Band readily states: "The Northwestern Band does not reside on Reservations at Fort Hall, Idaho, or Wind River, Wyoming." *Compl.* ¶ 29. The Northwestern Band also admits it "settled in northern Utah . . . ." *Id.* ¶ 31. Even when the Complaint is construed in a light most favorable to the Northwestern Band, it does not allege facts that provide for a finding by this Court that it has complied with the express terms of the Fort Bridger Treaty of 1868.

Because the Northwestern Band has failed to allege facts demonstrating it has complied with the Fort Bridger Treaty of 1868's requirement that the tribe make the reservations a permanent home, it is not, as a matter of law, entitled to exercise the Treaty's hunting and fishing rights. Therefore, this Court should dismiss the Northwestern Band's Complaint for failure to state a claim upon which relief may be granted.

> **b.** **Under the facts alleged in the complaint, the Northwestern Band has not maintained political cohesion with the tribes who signed the Fort Bridger Treaty of 1868.**

Treaty rights vest with tribes at the time of treaty signing. *United States v. State of Or.*, 29 F.3d 481, 484 (9th Cir.), *amended*, 43 F.3d 1284 (9th Cir. 1994), *cert. denied* 515 U.S> 1102 (1995). For tribes later asserting treaty rights the "critical issue" is whether the tribes have shown that they have maintained political cohesion with the tribal entities recognized or created by the

treaties and receiving hunting and fishing rights. *Id.* at 485.[7] A group seeking to exercise treaty hunting rights that is not a named signatory to the treaty "must trace a continuous and defining political or cultural characteristic to the entity that was granted the treaty rights." *Id.* The ultimate inquiry is "whether a group claiming treaty rights has maintained sufficient political continuity with those who signed the treaty that it may fairly be called *the same tribe*." *Oregon*, 43 F.3d 1284 (emphasis added).

Courts have established several relevant considerations under this analysis. A showing of common ancestry alone is not sufficient to establish political cohesion. *Id.* at 484. Likewise, showing that a tribe includes descendants of a signatory tribe is inadequate. *United States v. Suquamish Indian Tribe*, 901 F.2d 772, 776 (9th Cir. 1990). The Ninth Circuit has previously held that a group alleging treaty rights "disengaged" from the entity granted treaty rights, by "refusing to relocate to the reservation established by [the treaty]." *Oregon*, 29 F.3d at 486. Although failure to move onto the reservation is not by itself determinative of maintaining political cohesion, it is a relevant consideration under the inquiry. *Oregon*, 43 F.3d 1284.

The facts alleged in the Complaint contradict a finding that the Northwestern Band maintains political cohesion with the two recognized Shoshone parties to the Fort Bridger Treaty of 1868, the Shoshone-Bannock Tribes of the Fort Hall Reservation and the Eastern Shoshone Tribe of the Wind River Reservation. As set forth in the Complaint, the Northwestern Band did not follow the requirements of the Fort Bridger Treaty of 1868 and move onto either established reservation, thus disengaging itself from the signatory entities. *Compl.* ¶¶ 29, 31; *Oregon*, 29 F.3d at 486. Since 1868, the Northwestern Band has taken active steps to further disengage itself

---

[7] As discussed in *U.S. v. Oregon*, it was not unusual for the United States to "group traditional tribal entities for the purposes of negotiation." 29 F.3d at 484. As a result, many treaties "consolidated small tribes or bands into larger tribal entities for the purposes of the treaties." *Id.*

from the two signatory entities. The Northwestern Band readily admits it has "maintained an active political and cultural organization" as its own federally recognized sovereign Indian tribe, with its own Tribal Council and Tribal Code. *Compl.* ¶¶ 1, 29. The Northwestern Band is recognized as a completely distinct tribe from the separately federally recognized Shoshone-Bannock Tribes of the Fort Hall Reservation and the Eastern Shoshone Tribe of the Wind River Reservation. *E.g., Indian Entities Recognized by and Eligible To Receive Services From the United States Bureau of Indian Affairs*, 86 Fed. Reg. 7,554-01 (Jan. 29, 2021).

The Northwestern Band's sole argument for cohesion seemingly only relates back to the time of treaty signing or beforehand, when, according to the Complaint, Washakie was recognized as the principal chief of all Shoshone Indians. *Compl.* ¶¶ 22, 24. These factual allegations fall far short of the standard articulated in *United States v. Oregon* and *United States v. Suquamish Indian Tribe*. Taking the facts alleged in the Complaint as true, the Northwestern Band has not maintained political cohesion with either the Shoshone-Bannock Tribes of the Fort Hall Reservation or the Eastern Shoshone Tribe of the Wind River Reservation, such that it could be considered "the same tribe." Therefore, the Northwestern Band has failed to state a claim upon which relief can be granted and the Complaint should be dismissed.[8]

---

[8] The Northwestern Band's equal protection claim (*Compl.* ¶¶42-46) fails for similar reasons. With regard to equal protection, the Supreme Court has held that treaties "confer enforceable special benefits on signatory Indian tribes and has repeatedly held that the peculiar semisovereign and constitutionally recognized status of Indians justifies special treatment on their behalf when rationally related to the Government's unique obligation toward the Indians." *Washington v. Washington State Com. Passenger Fishing Vessel Ass'n*, 443 U.S. 658, 673 n. 20 (1979) (citation and quotation omitted). An ethnic Indian who is not a member of a tribe with reserved rights is in the same position with respect to fish and game laws as any other citizen of a state. *Puget Sound Gillnetters Ass'n v. U. S. Dist. Ct. for W. Dist. of Wash.*, 573 F.2d 1123, 1130 (9th Cir. 1978), *judgment vacated on other grounds*, 443 U.S. 658 (1979). Apportioning rights to treaty tribes differently than groups who do not hold treaty rights does not violate equal protection principles. *Id.* at 1127-30. Where the Northwestern Band is not similarly situated to

**3.**      **The Eleventh Amendment bars the claims against the State of Idaho, and the State should be dismissed as a defendant under Rule 12(b)(1).**

Alternatively, if any portion of this suit proceeds, the Eleventh Amendment applies. The Eleventh Amendment generally prohibits federal courts from entertaining a suit brought without a state's consent based on the principle of sovereign immunity. *Los Angeles Cty. Bar Ass'n v. Eu*, 979 F.2d 697, 704 (9th Cir. 1992). A limited exception exists, as originally articulated in *Ex parte Young*, 209 U.S. 123 (1908), allowing actions that seek only prospective declaratory or injunctive relief against state officials in their official capacities for continuing violations of federal law. *Edelman v. Jordan*, 415 U.S. 651, 667–68 (1974). Thus, the *Ex parte Young* exception to Eleventh Amendment immunity is narrow. *Doe v. Lawrence Livermore Nat. Lab'y*, 131 F.3d 836, 839 (9th Cir. 1997).[9]

Here, the Eleventh Amendment bars the Northwestern Band's suit against the State of Idaho, and the State has not consented to this lawsuit or otherwise waived its sovereign immunity.

<u>**CONCLUSION**</u>

Pursuant to Rules 12(b)(1), 12(b)(6), 12(b)(7) and 19, State Defendants respectfully ask this Court to dismiss the Complaint in its entirety for failure to state a claim, and for failure to

---

the Shoshone-Bannock Tribes relative to treaty rights under the Fort Bridger Treaty of 1868, the Band's members are in the same position with respect to state fish and game laws as any other resident or non-resident of Idaho.

[9] The Complaint also alleges "[t]he Northwestern Band's treaty reserved hunting rights are a property right which is protected by Article V of the United States Constitution, as applied through the Fourteenth Amendment, which cannot be deprived without due process of law and just compensation." *Compl.* ¶38. The Eleventh Amendment bars any claim for monetary damages against states, their institutions, and officers. *Shoshone-Bannock Tribes v. Fish & Game Comm'n, Idaho*, 42 F.3d 1278, 1283 (9th Cir. 1994). To the extent the Northwestern Band claims "just compensation" and "other relief as the Court deems just, equitable and proper," such relief is subject to Eleventh Amendment prescriptions, including the barring of monetary relief.

join an indispensable party, the Shoshone-Bannock Tribes. In the alternative, the Court should dismiss Defendant the State of Idaho because the Eleventh Amendment bars the claims alleged against the State.

DATED this <u>28th</u> day of July, 2021.

STATE OF IDAHO
OFFICE OF THE ATTORNEY GENERAL

*/s/ Kathleen E. Trever*_____
Kathleen E. Trever
Deputy Attorney General

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 28th day of July, 2021, I filed the foregoing electronically through the CM/ECF system, which caused the following counsel to be served by electronic means, as more fully reflected on the Notice of Electronic filing:

       Counsel for Plaintiff, the Northwestern Band of the Shoshone Nation
       RYAN B. FRAZIER (Idaho Bar No. 6201)
       Kirton McConkie
       50 East South Temple, Suite 400
       Salt Lake City, Utah 84111
       Telephone: (80 I) 328-3600
       Facsimile: (801) 321-4893
       rfrazier@kmclaw.com

                                  */s/ Kathleen E. Trever*_____
                                    Kathleen E. Trever
                                    Deputy Attorney General
                                    600 S. Walnut Street
                                    P.O. Box 25
                                    Boise, ID 83707
                                    kathleen.trever@idfg.idaho.gov