UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| NORTHWESTERN BAND OF THE SHOSHONE NATION, a federally recognized Indian tribe on its own behalf and as parens patriae on behalf of its members,<br><br>      Plaintiff,<br><br>v.<br><br>STATE OF IDAHO; GREG WOOTEN, Department of Fish and Game Enforcement Bureau Chief; ED SCHRIEVER, Department of Fish and Game Director, and DOES 1-10,<br><br>      Defendants. | Case No. 4:21-cv-00252-DCN<br><br>**MEMORANDUM DECISION AND ORDER** |

## I. INTRODUCTION

Pending before the Court is Defendants' Motion to Dismiss. Dkt. 7. Having reviewed the record and briefs, the Court finds that the facts and legal arguments are adequately presented. Accordingly, in the interest of avoiding further delay, and because the Court finds that the decisional process would not be significantly aided by oral

argument, the Court will decide the Motion without oral argument. Dist. Idaho Loc. Civ. R. 7.1(d)(1)(B).

Upon review, and for the reasons set forth below, the Court GRANTS the Motion.

## II. BACKGROUND

The Shoshone people once roamed over eighty million acres in the present states of Wyoming, Colorado, Utah, Idaho, and Nevada. The large tribe had a scattered organization, with an estimated fourteen different bands with various chiefs, sub-chiefs, and headmen. During the Civil War, Congress appropriated money for negotiating a treaty with the Shoshone to secure safe passage for transportation and communication lines through Shoshone territory. Due to the scattered nature and large size of Shoshone territory, the United States government entered into a variety of treaties with different Shoshone bands in a piecemeal fashion.

The treaty that concerns the Court today is the Fort Bridger Treaty of 1868 (the "1868 Treaty"). In that treaty, Chief Washakie ceded the Shoshone Tribal Territory to the United States in exchange for, among other things, two reservations and certain hunting[1] rights ("Hunting Rights"). The Hunting Rights are codified in Article 4 of the 1868 Treaty and outline that:

> The Indians herein named agree, when the agency house and other buildings shall be constructed on their reservations named, they will make said reservations their permanent home, and they will make no permanent

---

[1] In *State v. Tinno*, the Idaho Supreme Court defined the word "hunt" in the 1868 Treaty as both hunting and fishing because the Shoshone-Bannock Tribes did not historically employ separate verbs to distinguish between these activities. 497 P.2d 1386, 1390 (1972). As Defendants do not claim that hunting does not include fishing, the Court adopts the Idaho Supreme Court's understanding of the word "hunt" for the purposes of this case and concludes that "hunting" here means "hunting and fishing."

> settlement elsewhere; but they shall have the right to hunt on the unoccupied lands of the United States so long as game may be found thereon, and so long as peace subsists among the whites and Indians on the borders of the hunting districts.

*State of Idaho v. Warner*, Idaho Case Nos. CR-98-00014 and CR-98-00015, at 4 (Idaho Dist. Ct. 2000).

After signing the 1868 Treaty, many members of the Shoshone Nation gathered to the Fort Hall and Wind River Reservations. *Nw. Bands of Shoshone Indians v. United States*, 324 U.S. 335, 345 n. 7, *reh'g denied* 324 U.S. 890 (1945) (cleaned up). Plaintiff Northwestern Band of the Shoshone Nation ("Northwestern Band"), by its own admission, did not relocate to either reservation. Dkt. 1, at 9. The Northwestern Band adapted to an agrarian way of life and settled in northern Utah, the area in which it still resides today. The Northwestern Band is a distinct sovereign Indian tribe with its own Tribal office and Tribal Code.

The Northwestern Band believes that it possesses certain Hunting Rights, while the State of Idaho claims it does not. The Northwestern Band and its members disputed this issue in state court in 1997 in *State v. Warner*. Idaho Case Nos. CR-98-00014 and CR-98-00015 (Idaho Dist. Ct. 2000). This issue arose again in state court in 2019 when Wyatt R. Athay and Shanelle M. Long, both members of the Northwestern Band, were cited for hunting without tags issued by the State of Idaho (Case Nos. CR-04-19-0756; CR-04-19-0757). Mr. Athay and Ms. Long asserted their Hunting Rights, and the parties agreed to stay the matter pending the filing of this action, wherein the Northwestern Band seeks a declaration that it has Hunting Rights because of the 1868 Treaty.

MEMORANDUM DECISION AND ORDER - 3

The Northwestern Band filed a complaint on June 14, 2021, commencing the instant case. Dkt. 1. The Northwestern Band sued the State of Idaho; Greg Wooten, Enforcement Bureau Chief of the Idaho Department of Fish and Game; Ed Schriever, Director of the Idaho Department of Fish and Game; and any unknown defendants (indicated as Does 1–10) (collectively "Idaho Defendants"). Dkt. 1. Governor Brad Little of the State of Idaho was originally named as a defendant, but the parties stipulated to his dismissal early on. Dkt. 6. On July 28, Idaho Defendants filed the instant Motion to Dismiss pursuant to Fed R. Civ. P. 12(b)(1), 12(b)(6), and 12(b)(7). Dkt. 7. The Northwestern Band opposes said Motion. Dkt. 18. The motion is now ripe for adjudication.

## III. LEGAL STANDARD

### A. Rule 12(b)(1)

When subject matter jurisdiction is challenged pursuant to Federal Rule of Civil Procedure 12(b)(1), the plaintiff bears the burden of persuasion. *Indus. Tectonics, Inc. v. Aero Alloy*, 912 F.2d 1090, 1092 (9th Cir. 1990) (citing *McNutt v. Gen. Motors Acceptance Corp.*, 298 U.S. 178, 189 (1936)). A party who brings a Rule 12(b)(1) challenge may do so by referring to the face of the pleadings or by presenting extrinsic evidence. See *White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000) ("Rule 12(b)(1) jurisdictional attacks can be either facial or factual . . . .").

If the jurisdictional attack is facial, the challenger asserts that the allegations contained in a complaint are insufficient on their face to establish federal jurisdiction. *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004). When considering this type of jurisdictional attack, a court must consider the allegations of the complaint to be

true and construe them in the light most favorable to the plaintiff. *Love v. United States*, 915 F.2d 1242, 1245 (9th Cir. 1988).

"By contrast, in a factual attack, the challenger disputes the truth of the allegations that, by themselves, would otherwise invoke federal jurisdiction." *Meyer*, 373 F.3d at 1039. In resolving a factual attack on jurisdiction, the court need not presume the truthfulness of the plaintiff's allegations and may review evidence beyond the complaint without converting the motion to dismiss into a motion for summary judgment. *Id*.

### B. Rule 12(b)(6)

Federal Rule of Civil Procedure 12(b)(6) permits a court to dismiss a claim if the plaintiff has "fail[ed] to state a claim upon which relief can be granted." "A Rule 12(b)(6) dismissal may be based on either a 'lack of a cognizable legal theory' or 'the absence of sufficient facts alleged under a cognizable legal theory.'" *Johnson v. Riverside Healthcare Sys., LP*, 534 F.3d 1116, 1121 (9th Cir. 2008) (citation omitted). Federal Rule of Civil Procedure 8(a)(2) requires a complaint to contain "a short and plain statement of the claim showing that the pleader is entitled to relief," in order to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 554 (2007). "This is not an onerous burden." *Johnson*, 534 F.3d at 1121.

A complaint "does not need detailed factual allegations," but it must set forth "more than labels and conclusions, and a formulaic recitation of the elements." *Twombly*, 550 U.S. at 555. The complaint must also contain sufficient factual matter to "state a claim to relief that is plausible on its face." *Id.* at 570.

In deciding whether to grant a motion to dismiss, the court must accept as true all

well-pleaded factual allegations made in the pleading under attack. *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009). A court is not, however, "required to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001).

In cases decided after *Iqbal* and *Twombly*, the Ninth Circuit has continued to adhere to the rule that a dismissal of a complaint without leave to amend is inappropriate unless it is beyond doubt that the complaint could not be saved by an amendment. *See Harris v. Amgen, Inc.*, 573 F.3d 728, 737 (9th Cir. 2009).

### C. Rule 12(b)(7)

Rule 12(b)(7) allows for dismissal if an absent party—required to be joined under Rule 19—cannot be joined. In deciding a motion brought under Rule 12(b)(7), the allegations contained in the Complaint are accepted as true, and all reasonable inferences arising therefrom are drawn in favor of the plaintiff. *Paiute–Shoshone Indians of Bishop Community of Bishop Colony, Cal., v. City of Los Angeles*, 637 F.3d 993, 996 n. 1 (9th Cir. 2011).

## IV. DISCUSSION

### A. The Eleventh Amendment Bars the Claims Against the State of Idaho

The State of Idaho asserts that the Eleventh Amendment bars the claims raised against it. The Eleventh Amendment states that, "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. Amend. XI. The Eleventh Amendment prohibits a federal

court from entertaining a civil rights lawsuit brought by a citizen against a state unless that state waives its sovereign immunity. *Hans v. Louisiana*, 134 U.S. 1, 16-18 (1890). The State of Idaho has not waived its sovereign immunity in this case, nor has the Northwestern Band claimed the State has. Therefore, the claims against the State of Idaho are dismissed.

Defendants Wooten and Schriever acknowledge that the claims against them are not barred under the Eleventh Amendment, as the Northwestern Band can still bring an *Ex parte Young* action against them. Dkt. 19, at 11. *See Ex parte Young*, 209 U.S. 123 (1908) (the Eleventh Amendment does not bar suit against a government official in her official capacity for prospective injunctive relief only). The Court agrees. Thus, the Court GRANTS the Motion to Dismiss under 12(b)(1) only as it relates to the State of Idaho and dismisses the State of Idaho from the case.

### B.  The Northwestern Band Has Failed to State a Claim Under Rule 12(b)(6)

Idaho Defendants claim that the Court should dismiss the case for failure to state a claim upon which relief can be granted pursuant to Rule 12(b)(6). Idaho Defendants argue that the Northwestern Band is not entitled to Hunting Rights because the Northwestern Band has not met two conditions upon which the rights are predicated—namely, (1) the Northwestern Band has not made its permanent home on either of the relevant reservations, and (2) it has not maintained political cohesion with the tribes named in the Treaty. Notably, the first condition is allegedly imposed by the treaty, and the second condition is judicially imposed. *See United States v. State of Or.*, 29 F.3d 481, 484 (9th Cir. 1994), *amended*, 43 F.3d 1284 (9th Cir. 1994), *cert. denied* 515 U.S. 1102 (1995).

The Northwestern Band disagrees. The Northwestern Band argues that the 1868

Treaty does not require it "to make a reservation their permanent residence before it has Hunting Rights." Dkt. 18, at 15. The Northwestern Band also claims that "[a]t the very least, the language in Article 4 to the 1868 Treaty creates an ambiguity. In such circumstances, the language of the 1868 Treaty must be construed in favor of the Northwestern Band," as the "allegations in the Complaint must be taken as true," and the ambiguities must be construed in favor of the Northwestern Band under the Indian Canon of Construction. *Id*. at 17. The Northwestern Band also argues that the question of political cohesion is a factual question that is not suited for a determination on a motion to dismiss.

Interpreting the plain language of the treaty is appropriate at this stage of the proceedings. It is true that at the motion to dismiss stage the Court must accept as true all well-pleaded factual allegations made in the pleading under attack. *Iqbal* 556 U.S. at 678. A court is not, however, "required to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Sprewell*, 266 F.3d at 988. The Court is also not required to accept as true a party's *legal* conclusions. *Iqbal*, 556 U.S. at 678. As a legal document, it is appropriate at this stage for the Court to interpret the 1868 Treaty. However, in *applying* the legal interpretation to the facts at hand, the Court will do so in a manner that accepts as true all of the well-pleaded factual allegations from the Complaint.

### 1. *Plain Language*

The plain language of the 1868 Treaty clearly indicates that a necessary condition of receiving Hunting Rights was living on the Fort Hall Reservation or the Wind River Reservation. The pertinent language is contained in Article 4 of the treaty:

MEMORANDUM DECISION AND ORDER - 8

> The Indians herein named agree, when the agency house and other buildings shall be constructed on their reservations named, they will make said reservations their permanent home, and they will make no permanent settlement elsewhere; but they shall have the right to hunt on the unoccupied lands of the United States so long as game may be found thereon, and so long as peace subsists among the whites and Indians on the boarders of the hunting districts.

*Warner*, Idaho Case Nos. CR-98-00014 and CR-98-00015, at 4 (Idaho Dist. Ct. 2000). Idaho Defendants argue that the 1868 Treaty required all the signees to join a reservation but as an exception to staying on the reservation, Indians could leave to exercise their Hunting Rights. Dkt. 7-1, at 3–4. The Northwestern Band claims that the only conditions necessary to exercise the Hunting Rights is that "game may be found thereon" and "peace subsist." Dkt. 18, at 15. Idaho Defendants also claim the term "'but' separates two independent clauses" such that the conditions in the first independent clause (i.e., the language prior to the semicolon) are not applicable to the language in the second independent clause of that sentence. *Id*. at 16-17.

Here, the term "but" is a coordinating junction that joins two clauses in a compound sentence. The Northwestern Band (Dkt. 18, at 17) and Idaho Defendants (Dkt. 19, at 6) agree that the term "but" is conjunctive. In *Webster's New Collegiate Dictionary*, the term "but," when used as a conjunction, means "except for the fact," "without the concomitant that," "if not" and "yet." *But*, WEBSTER'S NEW COLLEGIATE DICTIONARY (1979). It also is defined as "on the contrary : on the other hand : NOTWITHSTANDING — used to connect coordinate elements." *Id*. Notably, each of these definitions indicates that the language preceding the term "but" in a sentence is related in some fashion to the language following that term.

MEMORANDUM DECISION AND ORDER - 9

Other courts have also used the conjunctive word "but" to provide an exception to the language that came prior to it. *See McNasby v. Crown Cork & Seal Co.*, 888 F.2d 270, 281 (3d Cir. 1989) ("In common usage, the conjunction 'but' is used to signify an exception to or limitation of what is implied by the content of the previous clause" (referencing *Webster's Third New International Dictionary* at 303 (1966)); *Winter v. Dibble*, 251 Ill. 200, 218 (1911) ("The clause is introduced by the word 'but,' which indicates an exception to what has gone before . . . ."); *State v. Marsh*, 108 N.W. 810, 812 (Neb. 1922) (concluding that because the term "'but' . . . has been judicially defined as 'except,' 'except that,' 'on the contrary,' 'or,' 'and also,' 'yet,' and 'still,'" the "two paragraphs of the section must be construed together and some significance attached to the word 'but.'"). Notably, the overwhelming use of the phrase "but" in the reference guide Words and Phrases is conjunctive. *See generally, But*, 5B WORDS & PHRASES 476–478 (Perm. Ed. 2021).

Here, the most reasonable reading is that the term "but" is an exception to the promise to stay on the reservation in the first independent clause, as the second independent clause explains the rights under which those Indians who live on the reservation may leave the reservation and still receive the benefits of the treaty.[2] Consequently, the ability to

---

[2] In addition, the word "they" denotes the same group of people throughout Article 4. The group that is giving the hunting permissions are "they" who are named and who have made the reservation their permanent home. Thus, by relating the pronouns back to their nouns, the statute would read as follows:

The Indians herein named agree, when the agency house and other buildings shall be constructed on their reservations named, they [the Indians herein named] will make said reservations their permanent home, and they [the Indians herein named] will make no permanent settlement elsewhere; but they [the Indians herein named who have made the reservation their permanent home] shall have the right to hunt on the unoccupied lands of the United States so long as game may be found thereon, and so long as peace subsists among the whites and Indians on the boarders of the hunting districts.

exercise Hunting Rights is irrevocably tied to the promise to live on the appropriate reservation. As explained above, the term "but" is most commonly seen to express an exception or addition to the language immediately preceding it. "But" rarely is used to combine two distinct ideas that have no relation with each other, which is what the Northwestern Band claims the treaty does.

A review of the rest of the 1868 Treaty reinforces this conclusion. The term "but" appears four other times in the 1868 Treaty. Each other time it is referenced (Article 1, Article 5, Article 6, and Article 9), the language following the term "but" is always building upon, elaborating, or distinguishing the language before it. Additionally, Article 4 is the only article in which the Indians promise to live on the reservation. The promise to live on the reservation was the most significant promise made by the Indians in that treaty. It would make little sense to claim that the promise to live on the reservation is only reserved to Article 4 and does not apply to the rest of the treaty. It makes even less sense to claim, as the Northwestern Band does, that the promise does not even apply to the *rest of the sentence*. Reading the treaty in that way would render the treaty as a series of disjointed promises by the Federal Government in exchange for *de minimis* consideration, at best. This would render the promise to live on the reservation as utterly superfluous and without meaning. Courts have an obligation to avoid "an interpretation of a congressional enactment which renders superfluous another portion of that same law." *U.S. v. Jicarilla Apache Nation*, 564 U.S. 162, 185 (2011) quoting *Mackey v. Lanier Collection Agency & Service, Inc.*, 486 U.S. 825, 837 (1988).

In sum, the promise to live on a reservation was a critical component of the 1868 Treaty, and indeed, was viewed as the solution to the wars between the settlers and the Indians. It would make little sense for the government to grant Hunting Rights but not receive anything in exchange. Based on the plain language, it is unambiguous that the Hunting Rights were inextricably tied to the promise to live on the reservation, and a tribe cannot receive Hunting Rights without living on one of the appropriate reservations.

It is important to address the Indian Canon of Construction that both parties raised in their filings. This canon states that "[a]s a general rule, treaties are to be construed, so far as possible, in the sense in which the Indians understood them, and ambiguous provisions [should be] interpreted to their benefit." *Makah Indian Tribe v. Quilete Indian Tribe*, 873 F.3d 1157, 1163 (9th Cir. 2017). Construing treaties in a manner in which the Indians understood them at the time of signing is fairly straightforward. However, interpreting ambiguous provisions in the Indians' benefit becomes complicated to apply when Indian tribes are suing each other. Indeed, in some of those cases, the Ninth Circuit has held the Indian Canon of Construction is inapplicable. *Confederated Tribes of Chehalis Indian Reservation v. State of Wash.*, 96 F.3d 334, 340 (9th Cir. 1996). The Ninth Circuit recently rejected an extreme interpretation of the canon, holding that:

> The Makah reads our precedent too broadly to advocate for its seemingly limitless rule that the Indian canon is inapplicable whenever another tribe would be disadvantaged. Not surprisingly, the Makah cites authority involving tribes claiming contradictory rights under the same statute or treaty; in those circumstances, the Indian canon is indeterminate because the government owes the same legal obligations to all interested tribes and "cannot favor one tribe over another." *Rancheria v. Jewell*, 776 F.3d 706, 713 (9th Cir. 2015); *Confederated Tribes of Chehalis Indian Reservation v. Washington*, 96 F.3d 334, 340 (9th Cir. 1996).

*Makah Indian Tribe v. Quilete Indian Tribe*, 873 F.3d 1157, 1163–64 (9th Cir. 2017). This guiding principle is admittedly fuzzy and difficult to apply, especially in the instant case, where an Indian tribe that is a *non-party* may be disadvantaged by the Court granting Hunting Rights to the Northwestern Band. However, as the Court does not see any ambiguities in the language of the 1868 Treaty, the Court does not need to apply a presumption in favor of the Northwestern Band.

As required by the Canon, the Court's interpretation aligns with how the 1868 Treaty would be understood by the Indians at the time it was written. It seems odd to claim that the Indians, a people that did not broadly emphasize reading and writing at the time of the 1868 Treaty, would have based their understanding of the treaty on the presence of a conjunction and a semicolon.

   2.   *The Plain Language Meaning is Reinforced by Contextual Reasons*

The Court concludes that living on an appropriate reservation is a necessary condition precedent to receive Hunting Rights. This is clear because of the plain language of the text. This conclusion is further strengthened by previous judicial interpretations and prior history. The 1985 memo written by the Department of the Interior ("DOI") offered as support for its position by the Northwestern Band is not binding and is not persuasive to the Court.

   a.   Interpretations by Other Courts

The District Court of the Seventh Judicial District of the State of Idaho dealt with the same issue regarding the Northwestern Band's rights under the 1868 Treaty twenty-

MEMORANDUM DECISION AND ORDER - 13

one years ago. *Warner*, Idaho Case Nos. CR-98-00014 and CR-98-00015, at 1 (Idaho Dist. Ct. 2000). In that case, an officer from the Idaho Department of Fish and Game cited Shane and Wayde Warner for hunting elk out of season. *Id*. The Warners, members of the Northwestern Band, admitted to hunting elk outside of the state season but asserted that their actions were protected by their Hunting Rights. *Id*. The state district court upheld the state magistrate court's decision that the Northwestern Band did not possess Hunting Rights. *Id*. at 10.

The state district court found that (1) the Northwestern Band had failed to maintain political cohesion with the tribes who signed the 1868 Treaty as it was required to do under *State of Or.*, 29 F. 3d at 484–86, and (2) the Northwestern Band had violated the plain language requirements of the treaty. *Warner*, Idaho Case Nos. CR-98-00014 and CR-98-00015, at 6, 8. The Idaho District Court explained that:

> The Northwestern Band has also violated the strict terms of the Ft. Bridger Treaty of 1868. The treaty states that in order to receive the hunting rights granted therein, the Indians "will make said reservations their permanent home, and they will make no permanent settlement elsewhere." The Northwestern Band has violated this condition. They have made permanent settlements elsewhere and have not made the reservation their "permanent" home. The Northwestern Band's tribal headquarters is not on the reservation but are located in Brigham City, Utah, and Blackfoot, Idaho. Neither of the Appellants live on the reservation, rather they both live in Pocatello.
>
> The hunting rights under the Ft. Bridger Treaty of 1868 were granted to the Eastern Shoshones and the Shoshone-Bannocks. In order for the Northwestern Band to have these same hunting rights, it would have had to move to the reservation and became part of either what is now generally known as the Eastern Shoshone tribe or the Shoshone-Bannock tribe for it is these two tribes in which the hunting rights are vested. By distancing themselves from these tribal entities, the Northwestern Band has no claim to those tribe's [sic] vested hunting rights.

*Id.* at 8–9 (cleaned up). By no means is this interpretation by an Idaho state district court binding on this Court. However, the Idaho state court's interpretation does strengthen this Court's conclusion because both state and federal courts are in alignment on the exact same question. Indeed, *Warner* affirmed the decision of an Idaho magistrate court, thus, there are actually three courts that have addressed this issue and are in agreement on the proper interpretation.

    b.  <u>Prior History</u>

The 1868 Treaty was signed approximately 150 years ago. In the time since then, the Northwestern Band only offers one situation when it attempted to regain those rights—the *Warner* case listed above. Northwestern Band also does not claim to have historically exercised those rights. The fact that the Northwestern Band and its members have only made one legal attempt to secure those rights since 1868 indicates that either the Hunting Rights have historically not been important to the Northwestern Band or that the Northwestern Band assumed it did not have those Hunting Rights. In any event, 150 years is a long time for a legal status to be presumed, and the Court is hesitant to overturn a status quo that has lasted so long.

    c.  <u>The DOI Memo</u>

Northwestern Band points the Court to a memo written by the DOI (specifically by Lawrence E. Cox, Acting Regional Solicitor of the Pacific Northwest Region (Dkt. 18-1, at 2)) that concludes the Northwestern Band has Hunting Rights under the 1868 Treaty. However, Northwestern Band's reliance on this memo is misplaced for several reasons.

First, the memo is not mandatory authority. "Solicitor's opinions . . . cannot properly be viewed as an administrative agency interpretation of statute that has the force of law." *McMaster v. United States*, 731 F.3d 881, 891 (9th Cir. 2013) (cleaned up). Thus, the Court is under no obligation to adopt the same interpretation of the law as the DOI memo. Second, the memo was written in 1985. It pre-dates several pertinent cases, particularly *State of Or.*, 29 F.3d at 481, which sets out the political cohesion requirement. Third, and most important of all, the DOI memo is not useful because it is not thorough. *By Northwestern Band's own admission*, the Northwestern Band's decision to not live on a reservation does not factor into the DOI's analysis. The DOI's main analysis mainly focuses on whether the Northwestern Band ratified the 1868 Treaty, not on the plain language of the treaty itself. The plain language of the treaty is a critical part of the instant case and is not something that can be ignored. The absence of such analysis by the DOI significantly undercuts the already limited usefulness of the DOI Memo in this case.

### 3. Political Cohesion Requirement

The Court declines to rule on whether the Northwestern Band has maintained political cohesion with the Shoshone-Bannock Tribes. Treaty rights vest with tribes at the time of treaty signing. *State of Or.*, 29 F.3d at 484. For a tribe to receive treaty rights, they must show "that they maintained political cohesion with the tribal entities created by the treaties." *Id*. at 485. A cohesion analysis is complex because it looks at a variety of factors to determine "whether a group claiming treaty rights has maintained sufficient political continuity with those who signed the treaty that it may fairly be called the same tribe." *State of Or.*, 43 F.3d at 1284. As one can imagine, such an analysis is very fact driven.

MEMORANDUM DECISION AND ORDER - 16

In this case, there is no need to do cohesion analysis. Because the plain language of the 1868 Treaty clearly indicates that the Northwestern Band does not qualify for Hunting Rights, the instant motion can be disposed of on other grounds, and the Court declines to rule on whether the Northwestern Band has maintained political cohesion with the Shoshone-Bannock Tribes over the last 150 years.

### C. Failure to Join an Indispensable Party

Idaho Defendants also claim that "[t]he Northwestern Band's Complaint should be dismissed under Rule 12(b)(7) for failure to join a necessary and indispensable party that cannot be joined due to sovereign immunity, the Shoshone-Bannock Tribes of the Fort Hall Indian Reservation." Dkt. 7-1, at 8. As members of the tribe living on a reservation created by the 1868 Treaty, the Shoshone-Bannock Tribes have an obvious, legally protected interest in the Hunting Rights, an interest that has been upheld by Idaho state courts. *See Tinno*, 497 P.2d at 1390; *Warner*, Idaho Case Nos. CR-98-00014 and CR-98-00015, at 6. The Shoshone-Bannock Tribes have taken an active interest in their rights, as they have protected their Hunting Rights through legal actions and have "enacted a detailed set of laws to govern hunting and fishing among their members." Dkt. 7-1, at 10.

Idaho Defendants claim the Shoshone-Bannock Tribes are an indispensable party because: (1) the Shoshone-Bannock Tribes' share of game would be significantly limited by others encroaching on their hunting and fishing rights; (2) the work that the Shoshone-Bannock tribes have done to defend and regulate their share of hunting and fishing

resources would be jeopardized;[3] and (3) allowing litigation to proceed without the Shoshone-Bannock Tribes would create a poor precedent because it "creates a risk that other groups could assert rights under the treaty and have their rights adjudicated without the Tribes' involvement in later proceedings" (*Id.* at 12, n. 6).

In layman's terms, Idaho Defendants argue the Shoshone-Bannock Tribes share of the "pie" will be diminished to a substantial degree and they should accordingly be viewed as an indispensable party.

Idaho Defendants also argue that the Shoshone-Bannock Tribes cannot be joined unless the Shoshone-Bannock Tribes waived their sovereign immunity, which they have not done in the instant case. Idaho Defendants finally claim that the Court should not join the Shoshone-Bannock Tribes because: (1) determining Hunting Rights is prejudicial against the Shoshone-Bannock Tribes, (2) relief could not be tailored in a way to lessen said prejudice, and (3) the judgment rendered by the Court in the absence of the Shoshone-Bannock Tribes would not be adequate because they would not have shared their view during the litigation. Idaho Defendants then conclude that because the Shoshone-Bannock Tribes are indispensable to the case and that they cannot and should not be joined, the case should therefore be dismissed under Rule 19(a).

---

[3] Idaho Defendants state "[f]or example, the Shoshone-Bannock Tribes have a program for off-reservation fishing allowing the take of Endangered Species Act (ESA) listed anadromous fish, including chinook salmon and steelhead. Allowing the Northwestern Band to use the same treaty rights to access the same fish would clearly impair and diminish the Shoshone-Bannock Tribes' treaty rights and further limit the Tribes' share of available ESA-protected fish." Dkt. 7-1, at 12 (cleaned up).

The Northwestern Band disagrees. It claims that "complete relief need only be possible 'among existing parties'" (Dkt. 18, at 5) and that such relief can be accorded between the Idaho Defendants and the Northwestern Band without involving the Shoshone-Bannock Tribes. Northwestern Band also claims that it is not asking that the Shoshone-Bannock Tribes' Hunting Rights be reduced or altered, and that the Hunting Rights are not a "zero-sum game." *Id*. at 6. In simple terms, the Northwestern Band states that "rather than arguing for a greater share of a limited pie, the Northwestern Band is instead requesting recognition of an expanded Hunting Rights pie." *Id*. The Northwestern Band also claims that the Shoshone-Bannock Tribes' interest in the disposition of the case does not rise to the level of a legal interest, and, therefore, joinder is not required. Northwestern Band does acknowledge, however, that there may be a future need to address allocation of fish and game if the Northwestern Band's suit prevails. *Id*. at 7.

If the Shoshone-Bannock Tribes are a necessary party, Northwestern Band argues the Shoshone-Bannock Tribes can be feasibly joined because they are not protected by sovereign immunity. Conversely, the Northwestern Band also opines that the case, in equity and good conscience, may proceed without the Shoshone-Bannock Tribes. The Northwestern Band argues that dismissal of this case would be unduly harsh as the Northwestern Band would not have any "venue or forum in which to vindicate its rights." *Id*. at 13. The Northwestern Band also claims that there are not any alternative remedies, as "[a]ppeals to the State of Idaho [have] been completely rebuffed" and "[t]here is no evidence that the Shoshone-Bannock Tribe would even negotiate." *Id*.

The Rule 12(b)(7) motion hinges upon how large the "pie" is. "Off-reservation hunting rights" encompasses a swath of land which neither party has adequately explained the boundaries of. One thing is certain, however—the area is large. For example, a Shoshone-Bannock tribal member's right to exercise his Hunting Rights was upheld near the Yankee Fork of the Salmon River in Custer County (*Tinno*, 497 P.2d at 1387), a fishing hole that is approximately three and a half hours away from the Fort Hall Reservation. Idaho Defendants claim that the ability of the Shoshone-Bannock Tribes to exercise its Hunting Rights would be severely limited and supports this claim by pointing to the limited availability of endangered fish like salmon and steelhead. Dkt. 7-1, at 12. Although it is easy to imagine disputes arising over endangered fish, the "unoccupied lands" referred to in the 1868 Treaty contain more wildlife than just salmon and steelhead.

Because the parties have not adequately explained how large the unoccupied lands are and what wildlife are in them, it is not clear to the Court at this stage just how significantly the Shoshone-Bannock Tribes would be impacted if the Northwestern Band gained and exercised Hunting Rights. The Court is also mindful of the potentially troublesome precedent of expanding the beneficiaries of the 1868 Treaty without having the main signatories—including the Shoshone-Bannock Tribes—involved. Normally the Court would ask for supplemental briefing to resolve this issue. However, because the Court's ruling on Idaho Defendants' 12(b)(6) Motion to Dismiss disposes of the case, the Court declines to rule on the question of the indispensability of the Shoshone-Bannock Tribe and DENIES this 12(b)(7) Motion to Dismiss as MOOT.

# V. ORDER

The Court HEREBY ORDERS:

1. The State of Idaho's Motion to Dismiss (Dkt. 7) is GRANTED in PART and DENIED in Part. The Motion is GRANTED as to the requests under Rule 12(b)(1) and Rule 12(b)(6). The Motion is DENIED as MOOT as to the request pursuant to Rule 12(b)(7).

2. This case is dismissed WITH PREJUDICE.[4]

DATED: January 19, 2022

David C. Nye
Chief U.S. District Court Judge

---

[4] Dismissal of a complaint without leave to amend is inappropriate unless it is beyond doubt that the complaint could not be saved by an amendment. *See Harris v. Amgen, Inc.*, 573 F.3d 728, 737 (9th Cir. 2009). Here, Northwestern Band could not successfully amend its complaint because based on the facts it has already alleged (namely, that the Northwestern Band does not reside on the appropriate reservations), the Northwestern Band cannot qualify for the Hunting Rights under the legal interpretation of the 1868 Treaty.

MEMORANDUM DECISION AND ORDER - 21